# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LARA HILL, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) No.  07 C 4335 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| NORCOMM PUBLIC SAFETY | ) |
| COMMUNICATIONS, INC., et al., | ) |
| | ) |
| **Defendants.** | ) |

## OPINION AND ORDER

Lara Hill sued the Village of Franklin Park ("the Village"), various police officers in the Franklin Park Police Department ("FPPD"), Norcomm Public Safety Communications, Inc. ("Norcomm"), and Michael Tillman alleging employment discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-1 *et seq*. Hill also alleges a civil conspiracy against Norcomm and Tillman for deprivation of  her constitutional right to equal protection, pursuant to 42 U.S.C. § 1985. Hill exhausted her administrative remedies and her case was filed within 90 days of receiving her notice of right to sue. All parties other than Norcomm and Tillman have settled.  Norcomm and Tillman move for summary judgment pursuant to Federal Rule of Civil Procedure 56 [#222].   For the reasons stated below, the motion is granted.

I.      **Hill's Employment at Norcomm**

Norcomm is an Illinois corporation that provides 911 dispatch services for local municipalities, including the Village. Norcomm staffed its Communication Center with 911 dispatchers known as Communications Operators ("C/Os"). On January 19, 2001, Norcomm hired Hill as a part-time C/O with Norcomm for its Franklin Park Communication Center. Prior to, during, and after her part-time employment with Norcomm, Hill also worked for the Village as a full-time police officer. At all times relevant to this lawsuit, Tillman was employed as the director of Norcomm's the Communication Center.

Norcomm has in place a progressive discipline policy that is designed to discourage repetition of the same or similar offenses that occur in the course of C/Os' highly sensitive 911 dispatching duties, which literally pertain to life-and-death matters. The discipline policy is laid out in Norcomm's Operations Manual.[2] A verbal warning is the lowest level of discipline under the policy, followed by written warnings, suspensions, and then termination. Examples of infractions that may warrant a verbal warning include tardiness, failure to complete daily duties, improper uniform, and inability to work with others. Norcomm's disciplinary notice form reflects the progressive discipline policy by including spaces for noting "Previous Warnings," "Action to be taken," and "Consequences should incident occur again."[3] Six months after being

---

[1] The facts are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at Part I. They are taken in the light most favorable to Hill, the non-movant.

[2] The same policies and procedures apply to both full-time and part-time dispatchers.

[3] When a supervisor issues a verbal warning, the C/O is still required to sign a written form

(continued...)

issued a verbal warning, the warning notice effectively expires and no longer counts against the C/O on the progressive scale. Nevertheless, the verbal warning notice remains in the C/O's personnel file permanently so that supervisors may determine whether the C/O has a history or pattern of continual disciplinary actions over a longer time period. Disciplinary issues that occurred more than six months prior are still considered for purposes of determining a course of action for new disciplinary issues that arise.

During the course of Hill's five-year employment history with Norcomm, she received a total of four documented verbal warnings. In addition, Tillman documented seven errors she made while on duty, although she was not formally reprimanded for these seven incidents. Hill's disciplinary record spans from November 2003 to July 2006.

### A. Hill's Performance Problems While on Dispatching Duty

On November 16, 2003, Hill sent a memo to Tillman about her interactions the day before with a fellow C/O, and she sent a copy to Commander Michael Witz of the FPPD. In the memo, Hill accused the C/O of poor job performance. She also accused him of making a racial slur against her. In a response memo dated November 19, 2003, Tillman expressed his displeasure with Hill's memo and her perceived inability to prioritize her job duties. He also wrote that certain complaints she discussed regarding her difficulty working with other dispatchers meant that she should consider resigning if these personality conflicts continued.

On January 13, 2004, Hill sent a fire truck to the wrong location. Tillman sent Hill a memo two days later asking her to provide an explanation for this oversight. Hill acknowledged

[3](...continued)
acknowledging that he/she understands that a verbal warning has been issued. The signature does not reflect an admission of culpability—merely an understanding of the events that precipitated the warning.

the mistake, and Tillman did not reprimand her.  Similarly, on June 8, 2004, Hill and another C/O missed radio traffic while on duty, which resulted in a 10-minute delay in an emergency vehicle's arriving on the scene.  Hill stated that she did not remember hearing the call, and she did not receive any formal reprimand for this error either.

On September 5, 2004, a call from a fire department came in seeking mutual aid from the Village's fire department for a fire in Northlake.  Hill and other C/O's failed to answer the call. As a result of this error, Hill received her first verbal warning from Tillman.

Within a two-month period in late 2005 and early 2006, Hill was notified twice of mistakes she made while on dispatch.  On December 5, 2005, during the first ten minutes of a traffic stop, Hill identified a police officer's location as "Franklin," without noting the numerical address.  Tillman gave her a verbal warning.  On January 29, 2006, Hill received a fire alarm call at a grade school. Official policy dictated that the fire department should be dispatched to all trouble alarms that do not restore after going off, but Hill failed to dispatch the fire department or document the occurrence.  Hill acknowledged that she made a mistake. She was not formally reprimanded.

On September 8, 2005, one of her co-workers wrote Tillman a memo in which she accused Hill of personally attacking her in an inappropriate manner during a shift.  Tillman met with Hill about the incident.  Hill agreed to provide a date on which she, Tillman, and Daly could meet to resolve conflict between the two women, but Hill never provided a date and no further action was taken.  Later in the month, however, Tillman and Hill exchanged emails in which Tillman listed several co-workers with whom Hill had had difficulty during her tenure at Norcomm.  Although Hill was never formally reprimanded for any dispute she had with a co-

worker, Tillman harbored concerns about Hill's ability to work amicably with other dispatchers in the stressful work environment.

### B. Hill's Disciplinary Record for Failing to Wear Uniform

As early as March, 2003, Hill understood that Norcomm adhered to a policy requiring all dispatchers to wear their uniform shirts during a shift. In May 2003, and again in March 2004 Tillman posted a memo at the dispatch center reminding all employees about the uniform policy. On August 25, 2004, Hill received a verbal warning for failing to wear her uniform shirt. This was her third verbal warning.

Approximately 18 months later, on March 9, 2006, Tillman entered the command center and noticed that Hill was not wearing her uniform shirt. Unprompted, Hill initiated the conversation by saying, "Don't even ask!" Undeterred, Tillman asked her why she was not wearing her uniform, and Hill provided an explanation that she no longer remembers. As a result, Tillman wrote up an employee-warning notice for Hill's failure to wear her uniform. Tillman then called Hill to his office, handed her the warning form, and explained that she was receiving a verbal warning for not wearing her shirt that day. Hill stated that she forgot her shirt and that everybody forgets their shirt. Tillman explained that while some other co-workers who do not wear their uniform receive verbal or written warnings as well. In response, Hill dropped the warning form on Tillman's desk and left his office without signing the warning form to acknowledge her receipt of it. Tillman followed Hill out to the dispatch center and asked her if she was going to sign the warning form. Hill did not provide an affirmative response, and Tillman repeated the question three more times. After repeatedly refusing to sign the form, Tillman sent her home for the day.

The next day, March 10th, Tillman wrote a memo to Hill detailing her actions the day before. In the memo, he wrote that Hill's behavior was "insubordinate" and stressed that her signature on the warning form (which she had not signed yet) indicated only that the disciplinary matter was discussed and that she understood what she was being written up for—it was *not* an admission of culpability. The memo advised Hill of the proper procedure for disputing a warning, which Hill failed to follow. "Instead," Tillman wrote, "you chose to be insubordinate by refusing to sign the warning and walking out of the office before finishing our conversation." Defs.' Ex. 18. The memo also stressed that Hill's part-time status did not excuse her from the same standards as every other employee. The memo included the following warning:

> Your continuance of employment with this company is conditional upon a few things: First, any additional acts of insubordination will result in termination. Second, you must read and sign this form . . . . Third, you must read and sign the verbal warning issued for the uniform violation. Failing to do so will result in your termination.

*Id.* On March 14th, Hill and Tillman met again regarding this incident. Hill read, signed, and indicated that she understood the memo and the conditional terms of her continued employment with Norcomm.

Despite these various incidents, prior to and during 2006 Hill received generally favorable evaluations in her performance reviews. On June 28, 2005, Tillman gave Hill an evaluation in which he rated her as "Meets Requirements." Tillman also praised Hill for her performance as a C/O and recommended that she receive the maximum raise based on her performance evaluation. In May 2006, Norcomm management authorized another raise for Hill. Tillman did not encounter any further disciplinary issues with Hill until June 2006.

**C.    Scheduling and Communication Problems**

As mentioned above, Hill had been a police officer with the Village since 1994. Tillman was aware that her primary duties on the police force took priority over her secondary employment as a 911 dispatcher. For example, Tillman testified that sometimes an officer had to cancel a shift at the last minute due to other more pressing police responsibilities. In such cases, Tillman had shown a willingness to make an exception for the officer's tardiness or inability to work dispatch so long as he was given advance notice. On May 18, 2006, Hill sent an email to Tillman regarding her availability for the month of June. In that email, she wrote that she was "waiting to find out my summer assignment with [the FPPD]" but she would turn in the June days she could work "for sure." Pl.'s Ex. O. She also advised him that if days were still left over, she would have an answer later as to whether she could work more. Tillman responded, "Ok" *Id.* Hill also provided Tillman with the July days she said she could work for sure. She never informed him that she might not be able to fulfill this commitment.

On June 11, 2006, Hill was absent–a so-called "no call/no show." Hill told Tillman that she had overslept. According to the Norcomm operations manual, a no call/no show is considered voluntary resignation from the company. Defs.' Ex. 1, at 11 ¶ I. This notwithstanding, Tillman accepted Hill's explanation and said that "it is unlike you to not show up for work." Pl.'s Ex. P. Hill did not receive a warning for her no call/no show.

During the morning of June 28, 2006, Hill received a memo from her Deputy Chief informing her that effective July 9, she would be "temporarily transferred to the afternoon watch of the Patrol Division until school session begins." Pl.'s Ex. R. Later that morning at 11:49 a.m., Hill sent Tillman an email concerning her July schedule: "Cancel all my July days, I cannot

work them.  Thanks."  Defs.' Ex. 6. At 12:25 p.m., Tillman replied, "Okay, all of them?"  *Id.*

Hill did not respond, and she never explaining her reason for cancelling her schedule.

That afternoon, Hill took off three weeks from her employment with Norcomm—time

she considered vacation.  She stayed home and did not leave town.  Due to Hill's absence,

Tillman had to find replacements for eight shifts totaling 56 hours.

At the time of Hill's three-week absence, Norcomm had a written policy governing

vacation time and requests for time off work.  First, all requests for time off should be made at

least two weeks in advance and submitted on a "time off request form."  Defs.' Ex. 1, at 13, § IV.

Second, "[v]acation requests must come at least one month in advance to guarantee the time off.

If time is requested after the one-month deadline, vacation will only be rewarded if shift

coverage can be obtained."  *Id.* at 17, ¶ F.  Hill's June 28 email was the only notification she

gave Tillman of her anticipated absence.

The next time Hill contacted Tillman was on July 14, 2006 around 5:15 p.m. when she

left Tillman a voicemail on his personal cell phone inquiring about the July and August

schedules.  Tillman stated that he did not return Hill's call because it was not urgent and he had

already left work for the day.  On July 18, 2006, Hill approached Tillman at the Norcomm

facility.  In that conversation, she attributed her sudden three-week absence to scheduling

conflicts with the police department arising from her reassignment.[4]

Tillman chastised Hill for her behavior and explained that her full-time job as a police

officer had nothing to do with her part-time job as a 911 dispatcher for Norcomm.  In a memo

---

[4] According to Tillman, Hill stated that "she was sorry that she had requested to be taken off the
July schedule but that her full-time job schedule was going to be changed and that her employers at her
full-time job were purposely trying to screw with her schedule."  Defs.' Ex. 7.

written to Norcomm's general manager, Dave Keller, on July 18, 2006, Tillman recounted Hill's recent behavior, noting, *inter alia*, that "[t]wenty days had passed without receiving any reason or notification as to why [Hill] needed to cancel," that he "never received any other correspondence or phone calls from [Hill] until today's meeting," and that he had observed her at her full-time job for the week of July 10th on three separate days without receiving "any additional information from her regarding her absence or request to be removed from the July schedule."[5]  Defs.' Ex. 7.  Tillman also told Hill that "a little courtesy and a more specific explanation is required to take [several weeks] off."  *Id.*  Tillman's memo recommended that Hill be terminated "because of her spitefulness and discourtesy, not only because of this matter but also because of documented issues that occurred in the past."  *Id.*  On July 18, Tillman told Hill that he was not going to schedule her for any more hours.

On June 30, 2006, Hill filed an EEOC charge against the Village in which she alleged sex discrimination against her full-time employer, the FPPD.  Notice of the charge was directed to the Village's Chief of Police, Thomas Wolfe, who received it shortly after June 30.  (Her charge against Norcomm was filed March 6, 2007).  Both Tillman and Keller testified during their respective depositions that they had no knowledge of Hill's EEOC charge as of July 18, 2006—the day she was terminated from Norcomm.

---

[5] The record also indicates that Tillman and Keller met in person to discuss Hill's performance and disciplinary issues.

## II.      Comparators

### A.      Steven Stelloh, Diego DiMarco, Joe Scarpelli, Ted Traister

The first set of alleged similarly situated male C/Os that Hill identifies are Steven

Stelloh, Diego DiMarco, Joe Scarpelli, and Ted Traister.  DiMarco was hired February 27, 2004

and resigned voluntarily on February 27, 2006.  Scarpelli was hired on January 26, 2006, and

was still employed at Norcomm as of August 13, 2009.  Stelloh was hired on October 10, 2002

and was still employed by Norcomm as of April 10, 2010.  Traister was hired in April 2001 and

remained employed by Norcomm as of May 2010.  According to personnel files, all four men

have been cited and reprimanded for various violations of company policy during their tenure at

Norcomm.  The incidents Hill recites in her statement of additional facts include, *inter alia*,

carelessness while on duty, routine dispatching errors, missing radio traffic, making personal

phone calls, uniform violations, tardiness, and difficulty cooperating with co-workers.

### B.      David Voytovick and James Klug

The other set of comparators includes two men who voluntarily resigned from Norcomm

after finding other full-time employment.  David Voytovick was hired as a full-time C/O in

February 2005.  In his first and only performance evaluation on June 28, 2005, Tillman noted,

"Dave is showing great strides in the short time he has worked here" and that increased job

knowledge "will come with time."  Defs.' Ex. 23.  Tillman also provided Voytovick with some

constructive criticism so that he might improve his performance over time.  No evidence exists

in the record that Voytovick received any warnings or reprimands.  In June 2006, Voytovick

resigned because he had found other full-time employment, although he wanted to become a

part-time Norcomm employee.  Tillman asked him to provide his part-time availability.  Tillman

called Voytovick at least three times to ask about his availability. Although Voytovick had said he would get in touch with Tillman to let him know of his availability, Voytovick never did so. After waiting for approximately one month, Tillman sent Voytovick a letter dated July 13, 2006, stating that he assumed he was not longer interested in the part-time opportunity. Defs.' Ex. 24.

James Klug, who had also work full-time prior to his resignation one month earlier, had also indicated a desire to work part time with Norcomm. Tillman followed up with phone calls to determine if Klug was still interested in pursuing the part-time opportunity. After receiving no response from Klug for approximately one month, Tillman sent the same letter to Klug as he had sent to Voytovick Pl.'s Ex. V. Tillman never sent a similar letter to Hill.

### III. Norcomm's Relationship with the Franklin Park Police Department

Managing Norcomm's business relationship with the city was an essential aspect of Tillman's job as director. As Norcomm had to compete with other dispatch services in the area, maintaining the Village contract was important to Norcomm and thus to Tillman. On more than one occasion, Dave Keller, Tillman's supervisor, reminded Tillman of this fact.

The Communication Center was located in the same building as the FPPD. Tillman's office was less than a minute's walk from Chief of Police Thomas Wolfe's office. When Wolfe became chief in 2006, Chief Wolfe dealt directly with Tillman, and as Norcomm's liaison Tillman made sure that the FPPD was satisfied with Norcomm's service. If a Norcomm employee passed by Chief Wolfe's office to go to the time clock, the employee could see into his office if the door was open. On one occasion, Commander Michael Witz observed patrol officer Mike Jones with his feet up on Chief Wolfe's desk, in the Chief's presence. Officer Jones and Tillman have been personal friends since 1993.

In 2006, now Deputy Police Chief Witz was a commander, reporting directly to Chief Wolfe. Witz was Hill's supervisor in her police officer job. Witz and Wolfe apparently did not have a good working relationship, and Witz believed that Wolfe was unhappy with his performance.

On September 21, 2006, Wolfe stated to Witz something to the effect, "You know what the fuck Hill is doing. I've been through this before. I've dealt with a person like her before, and I'll deal with her." *Id.* 38:21–39:2. Wolfe also asked Witz why Hill was giving him (Wolfe) such a hard time. Witz felt that he was "in the middle of something" between Wolfe and Hill, as there had been "conversations . . . and memorandums between all parties in reference to Chief Wolfe and Officer Hill at the time." *Id.* 41:7–13. Witz explained further that in September 2006, at Wolfe's direction, he issued memoranda to Hill concerning her on-time arrival as school liaison officer. Witz did not believe that Wolfe was singling out Hill for special treatment.

The only interaction between Tillman and Wolfe that can be found in the record is an email exchange between the two men in December 2006—several months *after* Hill was fired. Wolfe asked Tillman to "check to see that dispatch is logging Hill in on computer when she gets to school and leaves school," as Wolfe "[didn't] recall seeing her on the [mobile data terminal][6] last week." Pl.'s Ex. X. The next day, December 28, Tillman wrote back: "If she calls in, they are logging her on. If she does not call in, they are not logging her on because they don't know if she is here or not. Honestly, it seems for the past month or so, she rarely calls herself in." *Id.*

---

[6] A mobile data terminal (MDT) is a device in police squad cars that officers could use to sign themselves in while on duty. Chief Wolfe wanted all officers who did not have access to an MDT to be signed onto the computer aided dispatch system (CAD) so that dispatch and watch commanders were aware of who was working at any given time. Defs.' Ex. 2, at 195.

Immediately thereafter, Wolfe responded, "OK Mike, I will advise Cmdr[.] Witz to remind Hill she must keep her status current on computer." *Id.*

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the nonmoving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris, Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## I.      Compliance with Local Rule 56

Before addressing the merits of defendants' motion for summary judgment, the court first must rule on defendants' objections to Hill's response to their statement of material facts [#235], which the court treats as a motion to strike selected paragraphs identified in defendants' response.  *See* Minute Docket Entry, July 6, 2010 [#237].  Defendants contend that certain paragraphs in Hill's response to their statement of material facts fail to comply with Local Rule 56.1(b)(3)[7], and thus these paragraphs should be stricken from the record.

"District courts are entitled to expect strict compliance with Rule 56.1," which governs motions for summary judgment.  *Ciomber* v. *Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008) (internal quotations omitted).  "Substantial compliance is not strict compliance," and the court may strike those responses that do not strictly comply with the rule.  *Ammons* v. *Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *see also Bordelon* v. *Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) ("Given their importance, we have consistently

---

[7]  Each party opposing a motion filed pursuant to Fed. R. Civ. P. 56 shall serve and file . . .

(3) a *concise* response to the movant's statement that shall contain:

(A) numbered paragraphs, each corresponding to and stating a *concise* summary of the paragraph to which it is directed, and

(B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and

(C) a statement, consisting of *short* numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon. . . .

N.D. Ill. L.R. 56.1(b)(3) (emphasis added).

and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."); *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) (collecting cases). Failure to comply with Local Rule 56.1 justifies deeming the movant's statement of facts admitted. *Levie* v. *Sears Roebuck & Co.*, 676 F. Supp. 2d 680, 683 (N.D. Ill. 2009).

Many of Hill's responses neither admit nor deny the defendants' asserted fact; others offer a numerous additional facts and argument that do not rebut the asserted fact; and others contain improper objections." Defs.' Motion to Strike at 2. For these reasons, the court strikes the following 44 paragraphs from Hill's response: ¶¶ 10–11, 13, 16–19, 21–22, 25–26, 29–34, 36–40, 43–47, 51, 53, 55–56, 59–64, 67–68, 71–75.

Many of these responses deny defendants' facts without citing to any contradictory evidence in the record. When a party characterizes a fact as disputed, she must cite evidence that directly contradicts the fact, otherwise the fact is deemed admitted. *Senske* v. *Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009). In many paragraphs, Hill disagrees with defendants' wording while simultaneously admitting the same facts by pointing out meaningless distinctions without a difference.[8] *See, e.g.*, Pl.'s Resp. to DSOF ¶¶ 17, 18, 26, 34, 47, 54, 60, 74. Similarly, many of Hill's "denials" are nothing more than long arguments that present her interpretation of the facts.[9] *See, e.g., id.* ¶¶ 10, 19, 25, 36, 43, 61, 63, 67, 68. Rule 56.1(b) responses, however,

[8] To illustrate one representative example, in response to the fact, "Tillman advised plaintiff on July 18, 2006 that she was no longer employed part-time by Norcomm," Hill denies it and claims that on that date Tillman advised Hill that he would no longer schedule her to work. Pl.'s Resp. to DSOF ¶ 17. This is a distinction without a difference material to the issues before the court.

[9] For example, in ¶ 67, Hill takes up two pages purporting to deny the defendants' accurate account of her firing, but nothing in her long, rambling response actually denies the undisputed facts.

"[are] not a platform . . . to present a party's argument."  *Levie*, 676 F. Supp. 2d at 683.  Denying

a statement in the opposing party's facts when there is, in fact, no dispute only mischaracterizes

the evidence and is not permissible under the court's rules.  *See, e.g.*, *Buttron* v. *Sheehan*, No. 00

C 4451, 2003 WL 21801222, at *4–5 (N.D. Ill. Aug. 4, 2003).

Another frequent transgression in Hill's response is supplementing her admission of

defendants' statements with additional facts that do not appear in her own statement of additional

facts.  Several of these responses contain pages-long explanations that allege there is more to the

story and asserts facts more favorable to Hill.[10]  *See, e.g.*, Pl.'s Resp. to DSOF ¶¶ 13, 21, 22, 30,

32, 37, 38, 39, 45, 53, 64, 67, 69, 71, 72, 73.  This is inappropriate.  *McGuire* v. *United Parcel

Serv.*, 152 F.3d 673, 675 (7th Cir. 1998); *Buttron*, 2003 WL 21801222, at *5.  As Rule

56.1(b)(3)(C) clearly states, statements of additional facts belong in the nonmoving party's own

independent statement of facts.  In addition to striking responses that contain such additional

facts, the court will not consider these additional facts in ruling on the motion for summary

judgment.  *See Ciomber*, 527 F.3d at 643.

## II.     Count I:  Title VII Sex Discrimination

Title VII makes it unlawful for employers to terminate employees because of their

gender.  42 U.S.C. § 2000e-2(a)(1).  In alleging a Title VII violation, the employee may proceed

either directly, by presenting direct and/or circumstantial evidence of discriminatory intent, or

indirectly, by utilizing the burden-shifting method established by *McDonnell Douglas Corp.* v.

*Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).  *Wyninger* v. *New Venture Gear,*

---

[10] For example, in ¶ 68 of defendants' statement of facts, they cite Tillman's deposition testimony
in asserting that he did not have knowledge of Hill's EEOC charge.  Hill's response denies this fact, but
she presents no evidence that contradicts it.  Instead, her 1.5-page response includes a plethora of
additional facts that are nowhere to be found in Hill's statement of additional facts, where they should be.

*Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). Because Hill has not presented any evidence of direct discrimination, her Title VII claim proceeds under the *McDonnell Douglas* indirect method.

Under the *McDonnell Douglas* model, a plaintiff establishes a *prima facie* case of sex discrimination "if she demonstrates by a preponderance of the evidence that: (1) she is a member of a protected class; (2) at the time of termination, she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male . . . employees." *Peele* v. *Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). If the employer puts forth a nondiscriminatory reason for discharge, the plaintiff must rebut the employer's rationale "by presenting evidence sufficient to enable a trier of fact to find that the employer's proffered explanation is pretextual." *Id.* 'Pretext' "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani* v. *Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). Tillman and Norcomm acknowledge that Hill is a member of a protected class.

**A.     Was Hill meeting Norcomm's legitimate employment expectations?**

Under *McDonnell Douglas*, Hill must establish that she was doing her job well enough to meet her employer's legitimate expectations. *Mills* v. *First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 843 (7th Cir. 1996).[11]  When the plaintiff lacks direct evidence of discrimination, "and is

---

[11] Hill's memorandum in opposition to defendants' motion for summary judgment argues that Tillman's justification for firing her was a mere pretext to hide Norcomm's gender discrimination. Thus, this is a case where "the issue of satisfactory performance and pretext overlap." *Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010); *see id.* at 477–78 ("When the employer asserts as the nondiscriminatory reason for termination that the employee was not meeting legitimate job expectations, the credibility of the employer's assertion is at issue for both the second element of the plaintiff's *prima facie* case and the pretext analysis."); *Hague* v. *Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006) (continued...)

17

therefore totally reliant on the *McDonnell Douglas* formula, he is out of luck if he can't show that he was meeting his employer's legitimate expectations." *Coco* v. *Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997); *see also Peele*, 288 F.3d at 328 ("If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be put to the burden of stating the reasons for her termination."). Previous positive performance reviews can be relevant as to whether an employee is meeting legitimate expectations, but "they cannot demonstrate the adequacy of performance at the crucial time when the employment action is taken." *Dear* v. *Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009); *see also Senske* v. *Sybase, Inc.*, 588 F.3d 501, 506–08 (7th Cir. 2009) (explaining that employee was not meeting legitimate expectations despite earlier favorable performance reviews when subsequent performance problems were documented). Although Hill's positive evaluations in June 2005 and May 2006 must inform the analysis on the legitimate-expectations question, then, Hill's behavior in late June and July 2006 immediately before Norcomm fired her is more important.[12]

"An employee's failure to report to work may demonstrate that the employee is failing to meet his employer's expectations and defeat the employee's *prima facie* case of discrimination."

---

[11](...continued)
("[I]f the plaintiffs argue that they have performed satisfactorily and the employer is lying about the business expectations required for the position, the second prong and the pretext question seemingly merge because the issue is the same—whether the employer is lying."). If Hill cannot present sufficient evidence of pretext, she also cannot show that she was meeting Norcomm's legitimate expectations.

[12] Tillman's July 18, 2006 memo to supervisor Dave Keller recommending Hill's termination focused entirely on her abrupt absence during the first half of the month. The final sentence noted her "spitefulness and discourtesy" in this matter and also "documented issues that occurred in the past"; but it may be inferred that her behavior between June 28th and July 18th was the final straw. The court thus views this 20-day period in the summer of 2006 as the most significant evidence that bears on whether Hill was meeting Norcomm's legitimate expectations.

*Cardenas* v. *Fleetwood, Inc.*, 406 F. Supp. 2d 998, 1005 (N.D. Ill. 2005); *see also Nowak* v.

*Saint Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998) ("Obviously, an employee who does

not come to work cannot perform the essential functions of the job.").  Absenteeism, *in and of*

*itself*, can prevent an employee from meeting her employer's legitimate expectations.

*Campbell* v. *Dominick's Finer Foods, Inc.*, 85 F. Supp. 2d 866, 872 (N.D. Ill. 2000); *see also*

*Cowan* v. *Glenbrook Sec. Servs.*, 123 F.3d 438, 445 (7th Cir. 1997) (holding that plaintiff was

not meeting employer's legitimate expectations where plaintiff admitted several instances of

tardiness).  For example, in *Rush* v. *McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992), the

Seventh Circuit held that summary judgment in favor of the employer was justified where the

had been "absent from work for three days, and who did not give an explanation for her absence

until she returned."  *Id.* at 1115:

> It almost goes without saying that an employer has a legitimate interest in
> insuring that each employee's work continues at a steady pace to meet the
> employer's . . . needs.  Reliability and promptness are important considerations in
> maintaining a work force.  It seems self-evident that an employer is acting with a
> "legitimate, nondiscriminatory reason" in terminating an employee who simply
> fails to report to work and does not adequately explain his absence.

*Id.* at 1114–15. The Seventh Circuit has also affirmed summary judgment against insubordinate

employee on the basis that she did not meet her employer's legitimate expectations.  *See*

*Everroad* v. *Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010) ("[Plaintiff] was not

meeting her employer's legitimate expectations if she was insubordinate.").  The only relevant

question in this regard is whether the reason was pretextual:  "That a jury might disagree with

[the employer] or even find that they erred in their assessment does not render their termination

decision discriminatory."  *Id.* at 478 n.2); *see Ptasznik* v. *Saint Joseph Hosp.*, 464 F.3d 691, 696

(7th Cir. 2006) (explaining that even an employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, as long as the employer honestly held the belief).

An employee's admission to insubordinate conduct prevents the employee from establishing that she was meeting her employer's legitimate expectations. *See Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006) (granting summary judgment to defendant because plaintiff admitted the conduct which the employer proffered as the reason for plaintiff's termination); *Hague* v. *Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006) (same). Hill does not dispute any of the material facts that led to her termination. She admits that she accumulated four verbal warnings during her five-year tenure at Norcomm. She does not dispute any material circumstances surrounding the disciplinary action taken by Tillman in March 2006 as a result of her uniform infraction and ensuing insubordinate behavior. She admits that she was warned that any further acts of insubordination would result in termination. Finally and most critically, she admits that she took three weeks off without permission and without sufficient explanation. Hill's admission to these facts make it impossible for her to claim that she was meeting Norcomm's legitimate employment expectations.

**B.      Was a similarly situated male employee treated better than Hill?**

By failing to establish that she was meeting Norcomm's legitimate expectations at the time of her termination, Hill cannot satisfy the *McDonnell Douglas* test necessary to prove a Title VII violation.  Nevertheless, if male employees who did not meet the employer's legitimate expectations were not fired, the question would remain whether Hill was treated more harshly than they for the same conduct. *See Peele*, 288 F.3d at 330.  "A plaintiff may demonstrate that another employee is similarly situated to her by showing that there is someone who is directly comparable to her in all material aspects."  In the present context of disciplinary cases, *i.e.*, where a plaintiff claims that she was disciplined more harshly than a similarly situated employee based on a prohibited reason, the plaintiff "must show that she is similarly situated with respect to performance, qualifications, and conduct."  *Id.*  This demonstration requires showing that the two employees "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."  *Id.*

Hill first points to Stelloh, DiMarco, Scarpelli, and Traister, each of whom racked up various violations over several years but were not fired.  She also argues that Voytovick and Klug, were treated more favorably because Tillman called them after they resigned to inquire about whether they were going to come back on a part-time basis.

The evidence is not sufficient to raise a genuine issue of material fact.  Although Stelloh, DiMarco, Scarpelli, and Traister had a similar number of work violations, the context of Hill's situation is that her cancellation of her July hours without advance notice, her lack of communication with Tillman about her availability, and her three week unexplained absence were the reason she was fired.  The prior disciplines merely confirmed to him that termination

was justified. None of the males she uses as comparators were similar with regard to this critical fact.

Voytovick and Klug were not similarly situated to Hill, either in terms of disciplinary issues or scheduling issues. Both men advised Tillman that they would like to remain employed as dispatchers with Norcomm on a part-time basis, but they never provided Tillman with their availability. These men had no discipline in their backgrounds and left Norcomm for other jobs, suggesting that Tillman was eager to have them back part time. By contrast, Tillman terminated Hill after her "no call/no show" and other uncooperative behavior.[13] Tillman did, in fact, send a reply email to Hill asking her to clarify her unavailability for the entire month of July, but she did not respond.[14] Neither does Hill assert that she would have returned to work immediately if only Tillman had called her.

As the preceding analysis demonstrates, Hill has not demonstrated that similarly situated male employees were treated more favorably than she. For these reasons, Hill has failed to demonstrate a genuine issue of material fact that her termination was motivated by unlawful discrimination in violation of Title VII.

---

[13] The record is unclear whether Tillman did in fact try to contact Hill by phone during the three weeks she was absent from Norcomm. Regardless of whether he did or not, this matter is immaterial to the outcome. For purposes of the present analysis, the court assumes that Tillman did not call Hill between June 28 and July 18, 2006.

[14] Part time employment appears to have been an ad hoc arrangement that depended on one's continued availability. *See* Defs.' Ex. 19, David Keller Dep. 47 ("The part-timers . . . were either utilized or they weren't. If they couldn't comply, they were no longer used, utilized, called, or even asked to work."). Tillman's failure to contact Hill was consistent with this arrangment.

**III.    Count II: Title VII Retaliation**

It is unlawful for an employer to discriminate against an employee "because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  This type of discrimination is called "retaliation."  Specifically, Hill alleges that after she filled an EEOC charge against the Village, Norcomm unlawfully retaliated by firing her.

A plaintiff may establish unlawful retaliation under either the direct or indirect method of proof.  *Stephens* v. *Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).  To make out a *prima facie* case under the direct method, a plaintiff must demonstrate that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection exists between the two.  *Id.*  Under the indirect method, the first two elements remain the same, but instead of proving the direct causal link, the plaintiff must show that she was performing her job satisfactorily and that she was treated less favorably than a similarly situated who did not complain of discrimination.  *Id.* at 786–87.  If the employee establishes a *prima facie* case, the burden of production shifts to the employer to bring forth evidence of a nondiscriminatory reason for the employment action.  *Tomanovich*, 457 F.3d at 663; *Adusumilli* v. *City of Chi.*, 164 F.3d 353, 362 (7th Cir. 1998).  If the employer can provide a nondiscriminatory reason for the action, the burden shifts back to the employee to demonstrate that the explanation is pretextual.  *Moser* v. *Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005).  In this case, Hill argues that she has presented sufficient evidence to preclude summary judgment under both the direct and indirect methods.  The court addresses each method.

23

## A.     Direct Method

It is undisputed that Hill satisfies the first two elements required under the direct method. On June 30, 2006, she filed an EEOC charge alleging gender discrimination against the Village, which is unquestionably a protected activity. On July 18, 2006, she suffered an adverse action when Tillman fired her. It is thus the third element—establishing a causal connection between the filing of the EEOC charge and the firing—to which the court must turn.

To survive summary judgment in a case where an employee claims one employer retaliated against her for engaging in protected activity against another employer, the plaintiff must present enough evidence to show that the employer knew of the protected activity. *See Tomanovich*, 457 F.3d at 668–69. "It is not sufficient that an employer could have known or even should have known about an employee's complaint; the employer must have had actual knowledge of the complaints for its decisions to be retaliatory." *Id.* at 668 (quoting *Luckie* v. *Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004))."A Title VII plaintiff may rely on circumstantial evidence to establish her employer's awareness of protected expression." *Dey* v. *Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994). At the summary judgment stage, a plaintiff " must only produce evidence that would support an inference that [the employer] was so aware." *Id.* At the same time, however, a plaintiff's bare assertions that the employer knew of the protected activity are insufficient to survive the employer's motion for summary judgment. *See Salas* v. *Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007); *Tomanovich*, 457 F.3d at 668–69.

There is no evidence in the record before the court that could lead a reasonable jury to conclude that Tillman (or anybody else at Norcomm) knew about Hill's EEOC charge on July

18, 2006—the day she was fired. First, Tillman testified that he had no knowledge of Hill's EEOC charge against the Village, and this claim has not been contradicted. Second, Hill's basis for believing that Tillman knew about the charge is strikingly weak. In her deposition, she states that in May 2006 she "advised Tillman that [she] did not know what [her] summer schedule was going to be" and that Tillman's July 18th memo "states that [Tillman] understood [she] was having scheduling issues [with the FPPD]." Defs.' Ex. 4, at 15–16.[15] Yet Tillman's purported awareness of scheduling issues, without more, is not enough to establish his knowledge of Hill's EEOC charge. *See Salas*, 493 F.3d at 924; *Tomanovich*, 457 F.3d at 668–69. Hill's belief that Tillman knew is mere speculation.[16]

Hill also argues, however, that a jury could infer a causal connection between her EEOC charge and Tillman's decision to terminate her because less than three weeks elapsed between the date she filed her charge (June 30) and the date Tillman fired her (July 18th). Hill argues that the timing was "suspicious" and thus sufficient to make out an inference of discriminatory intent. Under the direct method, a plaintiff may raise a triable issue of a causal connection with

---

[15] Hill's allegations that Tillman knew about her scheduling issues with the FPPD prior to July 18, 2006 are belied by Tillman's memo detailing his conversation with Hill that same day. As Tillman recounts it, Hill told him that the FPPD was "purposely trying to screw with her schedule." Tillman explained that while he understood that she was having problems with the FPPD, "[Hill] never made me aware of those reasons prior to today's meeting." Moreover, he stressed that "her part-time job has nothing to do with her full-time job." Hill presents no evidence that Tillman had actual knowledge of the EEOC charge that day.

[16] Hill's response brief additionally notes that Wolfe had a practice of discussing "rumors" during weekly staff meetings, one of which was Hill's EEOC charge. The gist of her argument is that because Wolfe learned of the charge, and because Tillman communicated often with Wolfe, Tillman should have known about the charge before July 18th. Pl.'s Resp. 13–14; Pl.'s Resp. to DSOF ¶ 68. Alleging "rumors" as the basis for Tillman's knowledge does not bring Hill's claim above the speculative level, and crucially, the evidence upon which she relies to make these allegations is contained in paragraphs of her response to defendants' statement of facts that the court has stricken from the record. *See supra* Part I.

"circumstantial evidence of intentional retaliation, including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi* v. *Plastag Holdings, L.L.C.*, 489 F.3d 781, 792 (7th Cir. 2007) (citing *Troupe* v. *May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Hill must show "that the protected activity and the adverse action were not wholly unrelated." *Sauzek* v. *Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (quoting *Hunt-Golliday* v. *Metro. Water*, 104 F.3d 1004, 1014 (7th Cir. 1997)). "Speculation based on timing alone, however, does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Id.* Timing could be an important clue to causation, but the mere fact that the protected activity preceded the adverse action does nothing to prove that the first event caused the second. *Id*; *Bermudez* v. *TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998). "Rather, other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek*, 202 F.3d at 918. Although three weeks elapsed time between an employee's protected activity and an adverse action may support an inference of retaliation when coupled with other suspicious facts, Hill provides no such facts. In an attempt to argue otherwise, Hill's response brief claims that "Tillman's statement to Keller that 'recently' there were 'circumstances' that made Hill an 'undesirable employee,' (PSOF 25), without any further specifics, is a highly suspicious statement from which an inference of retaliatory intent may be drawn." Pl.'s Resp. 15. This passage of Hill's brief, however, quotes selectively from Tillman's deposition and is highly

misleading representation of what Tillman actually said.  Contrary to Hill's claim, Tillman did provide "further specifics," as is clear when the excerpt is read in its entirety:

> I explained to Mr. Keller that recently there's been several circumstances involving [Hill] that made her to be an undesirable employee, not showing up for work, I received an email from her telling me to take her off the July schedule.

Defs.' Ex. 2, at 135:21–136:1.  Moreover, Tillman's testimony is entirely consistent with the memo he composed on July 18, 2006, in which he explained in detail Hill's extended, unexplained absence as grounds for termination.  Hill can point to nothing suspicious about Tillman's statements: he fired her after she abruptly canceled her July shifts on short notice and became an "undesirable" employee.

In sum, the temporal proximity between her EEOC charge against the Village and her termination is not sufficient to establish a causal connection between these two events.  When an employee "presents no evidence to suggest that [those] who complained of her deficient performance were lying or that their motives in making those complaints were improper," the mere timing of the termination does not create a genuine issue as to a causal connection. *Juarez* v. *Ameritech Mobile Commc'n, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992); *see also Moser*, 406 F.3d at 905 (explaining that numerous incidents brought employee's professionalism and ability to serve into question and thereby undermined any inference of suspicious timing); *Adusumilli*, 164 F.3d at 363–64 (holding that sequence of events did not raise inference of a causal connection where employee failed to show she was fired for her complaint rather than for her inability to do her job well).

Further, where an employer has notified an employee of the deficiencies in her performance, given her the chance to correct them, and the employee continues to perform

deficiently, the employee can not raise an inference of retaliation.  *See Tomanovich*, 457 F.3d at

665–66; *Juarez*, 957 F.3d at 321–22. Tillman told Hill in March 2006 that she had acted

insubordinately and that any further insubordination would result in her termination.

Nevertheless, Hill took her unannounced vacation.  In the final analysis, Hill "has failed to

adduce evidence that would allow a rational trier of fact to conclude" that she was fired because

of her EEOC charge.  *Juarez*, 957 F.3d at 322.

### B.     Indirect Method

Under the indirect method for proving retaliation, the first two elements are the same, but

instead of proving a direct causal link, the plaintiff must demonstrate that she was performing

her job satisfactorily and that she was treated less favorably than a similarly situated employee

who did not complain of discrimination.  *Stephens*, 569 F.3d at 786–87.  In other words, Hill

"must show more or less the same four things that the [Title VII gender] discrimination claim

required."  *Dear*, 578 F.3d at 610–11.  As the court explained in analyzing her discrimination

claim, Hill "has not introduced enough evidence to reach a jury on the questions whether she

was performing her job satisfactorily and whether a similarly situated person received better

treatment."  *Id.* at 611.

Because Hill cannot prove her retaliation claim under either the direct or indirect method,

the court will grant summary judgment in favor of Norcomm on Count II.

**IV.       Count IV: Civil Conspiracy under 42 U.S.C. §§ 1983 and 1985**

Count IV of Hill's complaint alleges that Tillman illegally conspired with Village police officers to fire her in retaliation for filing the EEOC charge.  Liability under § 1985 must be predicated on a finding that two or more people agreed to violate the plaintiff's civil rights.  *See* 42 U.S.C. § 1985(3).  To establish liability under § 1983 through a § 1985 conspiracy theory, "a plaintiff must demonstrate that: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights; and (2) those individual(s) were willful participants in joint activity with the State or its agents."  *Williams* v. *Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (internal quotation marks, brackets and citations omitted).  The plaintiff must also show "some . . . class-based, invidiously discriminatory animus behind the conspirators' actions."  *Green* v. *Benden*, 281 F.3d 661, 665 (7th Cir. 2002).  While a conspiracy under § 1985 may be established by circumstantial evidence, such evidence must rise above the speculative level.  *Id.*; *Goetzke* v. *Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002).  A conspiratorial agreement thus may be established by circumstantial evidence "only if a reasonable jury could conclude that the conspirators had, in fact, reached an understanding that they sought to injure [the plaintiff]."  *Alexander* v. *City of S. Bend*, 433 F.3d 550, 557 (7th Cir. 2006).

Hill has not introduced evidence to support her allegations of a conspiracy.  In her deposition, the only alleged bases for her claim are the friendly relationships between Tillman, Chief Wolfe, and Officer Mike Jones and the suspicious timing of her termination.  *See* Defs.'

Ex. 4, at 164–65.[17]  Frequent contact between an employee's superiors, however, is insufficient

to establish a conspiracy; without more, to conclude that frequent meetings between alleged

conspirators would be sufficient "is the purest of conjecture."  *Alexander*, 433 F.3d at 557

(affirming summary judgment because evidence of phone calls between alleged conspirators,

standing alone, is only indicative of the fact that individuals stayed in touch); *Goetzke*, 280 F.3d

at 778 (same).  Hill presents no evidence that the three men ever discussed Hill or her EEOC

charge during a meeting, nor does she present any other evidence of discriminatory motive.  She

can only speculate about the substance of their conversations. In sum, there is no evidence of any

meeting of the minds by which a jury could plausibly find the existence of a conspiracy.[18]  Thus,

the court will grant defendants' motion for summary judgment on Count IV as well.

---

[17] Q.  Did Tillman have an agreement with members of the police department to try to get you fired from Norcomm?
A.  I believe they did.
Q.  Tell me everything you know about that agreement.
A.  I know that Mike Jones had much influence because he influenced Tillman to fire Natalie Sharp.  The relationship between Mike Jones and Mike Tillman goes way back; and on numerous occasions, Mike Jones would go into his office and shut the door.  Tillman and Jones would be in Chief Wolfe's office with their feet up on desks having private conversations.  So I am more than certain that things were discussed because of the timing of my EEOC charge and him terminating me less than three weeks after I filed that charge.
Q.  Do you think that Mike Tillman had an agreement with members of the police department to get you fired from Norcomm before you filed your EEOC charge?
A.  No.

[18] Norcomm also briefed the issue of whether the company could be held liable on the conspiracy claims absent a showing that it had a policy or custom of discrimination based on gender.  *See Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Generally speaking, to maintain a viable § 1983 action under *Monell* against a municipality or a private corporation acting under color of state law as though it were a municipal entity (e.g., Norcomm), the plaintiff must prove that a constitutional violation occurred as the result of an express policy or custom of the government unit.  *See Jackson* v. *Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002); *Iskander* v. *Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).  Hill has failed to create a genuine, triable issue of fact as to any illegal violation, however, and thus the issue of liability in this case is irrelevant.

**CONCLUSION**

For the foregoing reasons, the court grants Tillman and Norcomm's motion for summary judgment [#222]. The clerk is instructed to enter judgment for Norcomm on Counts I and II and for Norcomm and Tillman on Count IV. This case is terminated.

Dated: Dec. 22, 2010          Enter: _____

                                        JOAN HUMPHREY LEFKOW
                                        United States District Judge